UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| MARK WHALEY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 24-339-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| DEFINITIVE ROOFING AND | ) | **MEMORANDUM OPINION** |
| SPECIALTY COATINGS, LLC, et al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendants IB Roof Systems, Inc. ("IB"), Environmental Roofing Components, LLC ("ERC"), and Definitive Roofing and Specialty Coatings, LLC ("Definitive Roofing") have moved for summary judgment on Plaintiff Mark Whaley's claims. After reviewing the parties' arguments and relevant law, the undersigned is satisfied that all three have discharged their burden in demonstrating there is no remaining dispute of material fact.

Counterclaim Plaintiff Definitive Roofing has also moved for summary judgment on its claims against Whaley. After consideration, it has carried its burden regarding its breach of contract claim but not for its claims of quantum meruit, unjust enrichment, or fraudulent inducement. Finally, the defendants' motions to exclude Whaley's expert will be denied as moot because expert testimony is not necessary for the surviving three counterclaims.

## I.

Plaintiff Mark Whaley runs an online used bookstore from a commercial building in Burgin, Kentucky. The building is owned by his mother, Lillie Whaley. On March 31, 2022, a severe weather event dislodged a portion of the property's roof resulting in water penetration

- 1 -

to the interior.  [Record No. 12 at ¶ 7]  Mark Whaley contacted IB concerning a roof replacement some eight months later.  *Id.* at ¶ 8.  IB provided him with Lamar Eby's name. Eby is a nonexclusive sales representative for IB and other roof manufacturers.  [Record No 92 at 5]  Eby came to view the roof shortly thereafter.

Several months later (March 2023), Eby referred Whaley to Definitive Roofing's Rodney Vanlandingham for the roof repair.  [Record No. 92 at 12]  Three weeks thereafter, Vanlandingham presented the first of two roof repair proposals to Whaley for "Application of: ERC Wind Vent and IB PVC Membrane."  [Record No. 12 at ¶ 12]  Roughly four months after the initial proposal, Whaley forwarded his insurance claim information and adjuster contact to Eby who agreed to assist Whaley in working to help negotiate the proposed roofing system with the insurer.  *Id.* at ¶ 16 and 23.  Ultimately, Sedwick, an agent of Blackboard (the insurer of the subject property), approved the proposed roofing system.

Vanlandingham sent Whaley a second proposal for the roof repair in December 2023. [Record No. 94-2 at 133–34]  The parties signed it on February 6, 2024, after Whaley included an addendum to the contract that addressed some repayment terms.  *Id.*

Ken Fisher (a nonexclusive sales representative for ERC) along with Vanlandingham and Whaley met at the property on February 19, 2024.  [Record No. 96 at 2 (citing Record No. 96-1).] Fisher had contacted ERC technical representative Skip Bellus earlier that morning for approval to detach and use the loose laid, preexisting Hypalon membrane in place as a vapor barrier, rather than a new vapor barrier.  [*See* Record Nos. 92-5 at 4 and 96 at 3–4.]  Bellus confirmed that either option was acceptable.  [Record No. 96 at 3–4]  Ultimately, the parties agreed to use the preexisting membrane.  [Record No. 94-10 at 123]  Definitive Roofing began installing the roof shortly thereafter.

- 2 -

While the roof repair was ongoing (March 6, 2024), Whaley emailed Vanlandingham, complaining and expressing concern that the roof was leaking after a rain. [Record No. 94-10 at 44]  Vanlandingham responded, "I will get it taken care of.  I was planning on being there tomorrow." *Id.* at 44–46.  Whaley sent another email six days later informing Vanlandingham that the roof was leaking again, Vanlandingham replied, "I will see you in the morning." *Id.* at 47–50.  After that next day (March 13, 2024), Vanlandingham finished work on the roof.

The contract's payment terms noted the first installment was due upon delivery of materials.  Whaley made that $214,534.50 payment from the $319,990.68 of insurance proceeds he received.  [Record No. 94-2 at 133]  He kept the remaining amount in his possession. *Id.*  Regarding the second installment, the contract provided it was "due within 10 days of completion of job and final walk through inspection has been done." *Id.* at 134.  Vanlandingham and ERC had arranged with Whaley to complete the final walk through inspection on April 8, 2024.  With the parties approval of the completed work, the second payment installment would be due and warranties would issue.

But soon after Vanlandingham left the job site on March 13, 2024, an attorney for Whaley contacted Definitive Roofing claiming to be investigating a roofing defect as it continued to leak.  [*See* Record No. 94-2 at 144.]  About a week later (April 3, 2024), Definitive Roofing's counsel emailed Whaley's attorney, noting that the inspection was scheduled in a few days and that Definitive Roofing and ERC had already made all their flight and lodging arrangements for the inspection  *See id.*  Whaley's attorney notified Definitive Roofing that the inspection would be canceled. *Id.* at 145.  For five months (until this lawsuit commenced), Definitive Roofing attempted to gain access to the roof to inspect and remedy any purported leaks but was repeatedly denied that access. *See infra.*

The plaintiff filed this action in the Fayette Circuit Court on August 28, 2024. [Record No. 1-1 at 5] However, it was transferred to the Mercer Circuit Court based on improper venue. *Id.* at 36. The defendants then removed the matter to this Court based on diversity jurisdiction. [Record No. 1]

Following the prior Memorandum Opinion and Order, on IB's and ERC's motions to dismiss, only Whaley's product liability negligence claims against them survived. [Record No. 68] Definitive Roofing's motion to dismiss for failure to join the real party in interest and necessary parties was denied. [Record No. 68] The Court granted Definitive Roofing leave to file an Amended Counterclaim against Whaley for breach of contract, quantum meruit, unjust enrichment, and fraudulent inducement. [Record No. 83]

IB and ERC both move for summary judgment on Whaley's negligence claim. [Record Nos. 92 and 96] Definitive Roofing moves for summary judgment on Whaley's breach of contract, negligence, and violation of the Kentucky Consumer Protection Act ("KCPA") claims. [Record No. 94] It further moves for summary judgment on its counterclaims against Whaley for breach of contract, quantum meruit, unjust enrichment, and fraud in the inducement. *Id.* All three defendants move to exclude Whaley's expert Katie Dicks. [Record Nos. 93, 95, and 96]

## II.

Entry of summary judgment is appropriate if there are no genuine disputes regarding any material facts and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). The determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

- 4 -

party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

In the typical case, the moving party carries an initial burden to produce evidence to present a prima facie case that the movant is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 317. And once the moving party has met its burden of production, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Keeneland Ass'n, Inc. v. Earnes*, 830 F. Supp. 974, 984 (E.D. Ky. 1993) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Indeed, the nonmoving party cannot rely upon the assertions in its pleadings; rather, that party must come forward with probative evidence, such as sworn affidavits to support its claims. *Celotex*, 477 U.S. at 324. In making this determination, the Court must review all the facts and the inferences drawn from those facts in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

### III.

### Whaley's Claims Against IB and ERC

### Statutory Claims

As an initial matter, Whaley's responses to the manufacturers' motions for summary judgment attempt to interject a new claim not pled in his Amended Complaint. [*See generally* Record Nos. 100 and 102.] He appears to argue that, because the roof design and install violates building code, IB and ERC (either independently or vicariously through Eby and Fisher) breached their duty. However, he did not plead a negligence *per se* or a statutory building code violation claim, and he cannot add one now. In trying to shoehorn these claims

- 5 -

into the case, Whaley attempts to alter the negligence standard from using reasonable care to protect against foreseeable dangers to one requiring liability for building code violations.

"In Kentucky, negligence *per se* is 'merely a negligence claim with a statutory standard of care substituted for the common law standard of care.'" *Christensen v. ATS, Inc.*, 24 F. Supp. 3d 610, 613 (E.D. Ky. 2014) (citing *Young v. Carran*, 289 S.W.3d 586, 588–89 (Ky. Ct. App. 2008)). For negligence *per se* pursuant to KRS 446.070 to apply, the statute at issue must not provide an inclusive civil remedy. *Id.* (citing *Young*, 289 S.W.3d at 589). Further, the statute's "violation must have been a substantial factor in causing the plaintiff's injury." *Id.* at 613–14 (citing *McCarty v. Covol Fuels No. 2, LLC*, 978 F.Supp.2d 799, 808–09 (W.D. Ky. 2013)).

When building codes are violated, "KRS 198B.130 provides for a private right of action for costs incurred in bringing [the] property up to code compliance." *Deitz v. Owen*, No. 2012-CA-000330-MR, 2015 WL 301214, at *2 (Ky. Ct. App. Jan. 23, 2015) (citing *Real Estate Mktg., Inc. v. Franz*, 885 S.W.2d 921, 925 (Ky. 1994), *overruled on other grounds by Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729 (Ky. 2011)). "The Kentucky Supreme Court has interpreted KRS 198B.130 as requiring 'payment of either the cost of repair to bring the property up to code compliance or payment of the diminution in fair market value of the property because of code infractions, whichever is less." *Crouch v. Bilbrey*, No. 2011-CA-002098-MR, 2013 WL 1003444, at *4 (Ky. Ct. App. Mar. 15, 2013). Further, a prevailing plaintiff may be awarded "damages, cost of litigation, and attorney's fees," and recovery "is compensable as a matter of law beyond a breach of contract." *Deitz*, 2015 WL 301214, at *2 (citing *Franz*, 885 S.W.2d at 925). But "an award of damages does not automatically flow

- 6 -

from a violation of the building code.  KRS 198B.130's permissive use of 'may' recognizes the longstanding principle that damages must be proven." *Crouch*, 2013 WL 1003444, at *3.

Whaley failed to plead building code violations under KRS 198B.130 or negligence *per se* under KRS 446.070 in his Amended Complaint.[1]  [*See* Record No. 12.]  The United States Court of Appeals for the Sixth Circuit has recognized that a "'plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion.'" *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 2723 (3d ed. Supp. 2005)).

Even still, if KRS 446.070 applied and substituted the standard of care with the statutory one in KRS 198B.130, as a matter of law, under the facts presented, product manufacturers IB and ERC did not have a duty to ensure that their products were installed according to building code.[2]  The building code schemes recognize this as they place duties on applicants for building permits (ordinarily, builders and installers).  *See e.g.*, KRS 198B.060(8).

### Negligence

**Product Liability:** A negligence claim requires a plaintiff prove (1) duty, (2) breach of that duty, and (3) consequent injury, which includes actual injury and legal causation

---

[1]    Although the Court denied Whaley leave to amend his Amended Complaint, he did not seek amendment to add either of these statutory claims. [Record No. 68]  Instead, he wanted to "explicitly plead claims for breach of an implied contract, breach of the implied warranty of fitness for a particular purpose, breach of an express warrant, or product liability." [Record No. 48 at 17]

[2]    That ERC President Jim Hines' letter approving the roof assembly as part of the warranty issuance process does not change this result.  [*See* Record No. 100 at 10.]

between the breach and the injury. *Hurst v. Dixie Truss, Inc.*, No. 2020-CA-0816-MR, 2021 WL 1826881, at *5 (Ky. Ct. App. May 7, 2021) (citing *Keaton v. G.C. Williams Funeral Home, Inc.*, 436 S.W.3d 538, 542 (Ky. App. 2013) and *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88–89 (Ky. 2003)). For product liability negligence claims involving products that are not unreasonably dangerous, the standard is "'what a prudent manufacturer, engaged in a business similar to that of the defendant, by the exercise of ordinary care actually should have discovered and foreseen.'" *See Worldwide Equip., Inc. v. Mullins*, 11 S.W.3d 50, 55 (Ky. Ct. App. 1999) (quoting *Ulrich v. Kasco Abrasives Co., Ky.*, 532 S.W.2d 197, 200 (Ky. 1976)). To prevail, the plaintiff must demonstrate that the manufacturer failed "to use reasonable care to protect against foreseeable dangers." *Stiens v. Bausch & Lomb Inc.*, 626 S.W.3d 191, 200–01 (Ky. Ct. App. 2020); *Ostendorf v. Clark Equip. Co.*, 122 S.W.3d 530, 535 (Ky. 2003).

The ERC wind vent system installed on Whaley's roof incorporates an IB membrane. Whaley agrees that the IB membrane and ERC wind vent system components are not defective as standalones. [Record No. 102 at 1] Instead, Whaley takes issue with the design and installation of the roof. Specifically, he asserts that Eby and Fisher undertook voluntary duties in the roof's design and installation oversight, such that IB and ERC should be liable for Eby's and Fisher's alleged breach of that duty. Whaley claims that breach is evident because the roof's design and install violated various building codes and industry standards, and it continues to leak.

No matter the framing, Whaley's negligence claims against IB and ERC fail. His expert confirmed that there were no discernable defects with the roofing components furnished by IB or ERC. Even in the context of strict liability (which is a more arduous standard than the one for negligence), Kentucky courts have recognized that "a component part supplier has no duty,

independent of the completed product manufacturer, to analyze the design of the completed product which incorporates its non-defective component part." *Worldwide Equip., Inc.*, 11 S.W.3d at 57 (Ky. Ct. App. 1999) (quoting *Childress v. Gresen Mfg. Co.*, 888 F.2d 45, 49 (6th Cir. 1989)). Therefore, Whaley's product liability negligence claims fail.

**Voluntary Duty:** "[O]ne who volunteers to act, though under no duty to do so, is charged with the duty of acting with due care." *Ostendorf*, 122 S.W.3d at 538 (citations omitted). "In Kentucky, the existence of a duty is a matter of law for the court because '[w]hen a court resolves a question of duty it is essentially making a policy determination.'" *Id.* at 533 (quoting *Mullins v. Commonwealth Life Ins. Co., Ky.*, 839 S.W.2d 245, 248 (Ky. 1992)).

That said, "an employer is not liable for the torts of an independent contractor in the performance of his job." *Miles Farm Supply v. Ellis*, 878 S.W.2d 803, 804 (Ky. Ct. App. 1994). Because an employer lacks control over the "method, manner, and details" of an independent contractor's work, it should not be held liable for the contractor's tortious conduct. *See Witt v. Xhale Salon & Spa*, No. 2023-CA-0274-MR, 2024 WL 648805, at *4 (Ky. Ct. App. Feb. 16, 2024) (citing *Nazar v. Branham*, 291 S.W.3d 599, 606–07 (Ky. 2009)). Determining whether an individual is "an employee or independent contractor may be a matter of law based on the undisputed circumstances of record." *Id.* (citing *Everett v. Edelin*, 672 S.W.3d 196 (Ky. App. 2023)).

Whaley argues that IB and ERC voluntarily undertook a duty concerning the design and installation oversight of the roof through Eby's and Fisher's actions.[3] [Record No. 102 at

---

[3]    To the extent that Whaley argues that Eby and Fisher took on a voluntary duty, such that they should be liable in negligence individually, that argument fails. Neither are named defendants in this case.

12]  He argues that IB (through Eby), "in all reality sold him the roof replacement plan over the full replacement required by the building code." *Id.* at 2.  Whaley makes similar claims concerning Fisher's participation in the roof repair.  For example, he asserts that Fisher consulted with him on using the preexisting Hyphalon membrane as a vapor barrier by providing the pros and cons of using it instead of a new vapor barrier. *Id.* at 15.  Ultimately, ERC approved the use of the preexisting membrane in the wind vent system, which Whaley argues violated building code. Therefore, he claims that IB's and ERC's roles extended beyond those of passive suppliers subjecting them to liability for Eby's and Fisher's actions and representations.

IB asserts that Eby was a "non-exclusive independent contractor that sells roofing materials from various manufacturers." [Record No 92 at 5]  It further contends that Eby's limited role included one visit to the property to walk the roof more than a year before construction began and introducing Whaley to Definitive Roofing.  *Id.* at 12.  It likewise provides that Fisher was an independent representative for ERC and "was neither an employee nor independent representative for IB." [Record Nos. 92 at 4 and 92-3 at ¶ 6]  Therefore, it argues that IB cannot be vicariously liable for any purported torts committed by Eby or Fisher. Notwithstanding that fact, IB notes that Whaley alleged no vicarious liability claims in his Amended Complaint.  [Record No. 92 at 12] Thus, it is questionable whether it is even necessary that the Court engage in the independent contractor/employee analysis.

Like IB, ERC insists that it merely supplied the wind vent components and that Fisher's limited role was to "walk the property and get a count on the material that would be needed" and be available to answer Vanlandingham's questions.  [Record No. 96 at 2–3] It provides testimony from Fisher that he "is an independent contractor who represents a number of

roofing manufacturers on project based representations." *Id.* at 2 (citing Record No. 96-1). It acknowledges that Fisher was eligible for a commission from ERC on the wind vent components and for a commission from IB for the use of its membrane in the system. [Record No. 96 at 2] ERC contends that Fisher's role was assisting Vanlandingham in procuring the correct type and quantity of materials from ERC. *Id.* at 3. While Fisher contacted ERC Senior Field Technician, Skip Bellus, concerning the use of the preexisting membrane as a vapor barrier, neither he nor ERC were asked to consult on building codes. *Id.* at 4. Instead, the nature of the inquiry pertained to whether the use of the membrane (rather than a new vapor barrier) was a viable option. Bellus noted that it was a permissible substitute. *Id.* at 3.

According to Whaley, Eby worked on the roofing project by negotiating its scope and payment with the insurance company. [Record No. 102 at 4–5] Whaley asserts that Eby and Fisher assisted in the roof's design and installation plan, which included building code considerations. [Record Nos. 100 at 6 and 102 at 4] Specifically, he claims that Eby knew the roof substrate was wet, but still recommended a roof recover as opposed to total replacement. [Record No. 102 at 7] Whaley argues that IB and ERC, through Fisher, approved the use of the preexisting membrane as a vapor barrier, which violated building code. *See id.*

Whaley insists that Eby and Fisher held themselves out to be working for Definitive Roofing, IB, and ERC, but stops short of explaining how this imposes liability on any company. [Record Nos. 100 at 6 and 102 at 3, 7] Or alternatively, he argues that Definitive Roofing, IB, and ERC held Eby and Fisher out as their agents.[4] [*See* Record No. 100 at 5.] If

---

[4]    Whaley cites *Mt. Holly Nursing Ctr. v. Crowdus*, 281 S.W.3d 809, 813 (Ky. Ct. App. 2008), for the proposition that Fisher had apparent authority to act on behalf of ERC based on ERC holding him out as having that authority. [Record No. 100 at 6 n.3] Problematic for Whaley is that his Amended Complaint contains no vicarious liability claim.

anything, this supports IB's and ERC's contentions that Eby and Fisher were nonexclusive *independent contractors*. Further, Whaley brings no fraudulent misrepresentation claim against Eby or Fisher, nor are they defendants in the Amended Complaint. [*See* Record No. 12.] The Amended Complaint similarly lacks claims for fraudulent misrepresentation or vicarious liability against IB and ERC. *See id.* Whaley further suggests that, because Eby and Fisher stood to earn commission on the sale of the manufacturers' products (that would also earn revenue), liability should attach to the manufacturers for Eby's and Fisher's alleged tortious acts. [*See* Record No. 102 at 7–8. ]

Although none are independently determinative, when ascertaining whether an individual is an independent contractor or employee, courts consider:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is a part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of master and servant; and (j) whether the principal is or is not in business.

*Witt*, 2024 WL 648805, at *4 (citing *Everett*, 672 S.W.3d at 201; RESTATEMENT (SECOND) OF AGENCY § 220(2)).

Applying those factors would support that Eby and Fisher were not IB's or ERC's employees. For starters, Whaley does not dispute that Eby and Fisher did not work exclusively for IB or ERC. In fact, he contends that they worked for both IB and ERC. It defies reason that a company would permit its employee to also work for its competitors. Concerning

payment, Eby and Fisher received commission from IB and ERC based on orders for roofing materials, not salary or hourly pay. So too regarding the lack of control IB and ERC exercised over the method, manner, and details of Eby's and Fisher's work. There is no indication that IB or ERC exercised control over Eby's or Fisher's recommendation or sale of one product (or manufacturer) over another.

Whaley neither disputes nor provides evidence refuting IB's Vice President of Technical and Product Development Joel King's declaration that "Eby was a non-exclusive independent sales representative for IB," not its employee. [Record No. 92-3 at ¶ 5] The same is true for King's declaration that "Fisher was neither an employee nor independent representative for IB" during the relevant period. *Id.* at ¶ 6. Likewise, Whaley does not dispute that Fisher was not ERC's employee. [Record No. 96 at 2 (citing Record No. 96-1).]

Thus, based on "the undisputed circumstances of record" the Court concludes that neither Eby nor Fisher are IB's or ERC's employee as a matter of law. *See Witt*, 2024 WL 648805, at *4 (citing *Nazar*, 291 S.W.3d at 606–07). And because they were independent contractors, IB and ERC cannot be held vicariously liable for their acts concerning work that was neither a nuisance nor inherently dangerous. *See Miles Farm Supply*, 878 S.W.2d at 804 (citing *City of Hazard Municipal Housing Commission v. Hinch, Ky.*, 411 S.W.2d 686 (1967)).

In addition to the enumerated reasons, Whaley's negligence claim also fails at causation. The gist of his argument is that IB and ERC violated building codes and those violations caused the roof to leak, resulting in damages. But as discussed in greater depth below, Whaley blocked access to his roof for the final inspection which was necessary to complete the roof repair and an opportunity for him to raise his grievances for correction.

**Claims Between Whaley and Definitive Roofing**

**Negligence and the Economic Loss Rule**

As noted previously, a negligence claim requires that a plaintiff prove (1) duty, (2) breach of that duty, and (3) consequent injury, which includes actual injury and legal causation between the breach and the injury.  *Hurst*, 2021 WL 1826881, at *5.

However, the economic loss rule "prevents the commercial purchaser of a product from suing in tort to recover for economic losses arising from the malfunction of the product itself, recognizing that such damages must be recovered, if at all, pursuant to contract law." *Giddings*, 348 S.W.3d at 733.  Economic loss is the loss of a product's value caused by a product's defect (direct economic loss) and consequential loss from the defect, including lost profits (consequential economic loss).  *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002) (citing Louis R. Frumer & Melvin I. Friedman, PRODUCTS LIABILITY, § 13.07 (Matthew Bender, Rev. Ed.) (2014)).  The Supreme Court of Kentucky has elucidated that this "rule recognizes that economic losses, in essence, deprive the purchaser of the benefit of his bargain and that such losses are best addressed by the parties' contract and relevant provisions of Article 2 of the Uniform Commercial Code." *Giddings*, 348 S.W.3d at 738.  This ensures that contract law does not "drown in a sea of tort." *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 866 (1986).

While some courts have refused to apply the economic loss rule to purely service contracts, others have been willing to apply the rule in mixed contracts involving goods and services.  *See Louisville Gas & Elec. Co. v. Cont'l Field Sys., Inc.*, 420 F. Supp. 2d 764, 769 (W.D. Ky. 2005); *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 791–92 (Ky. 2017); *Morris v. Tyson Chicken, Inc.*, No. 4:15-CV-00077-JHM, 2015 WL

- 14 -

7188479, at *4 (W.D. Ky. Nov. 13, 2015) (collecting construction contract cases). When deciding if the economic loss doctrine applies, courts consider whether the tort action is premised on a claim independent from the contract claim. *Superior Steel*, 540 S.W.3d at 791 (citing *Presnell Constr. Managers, Inc. v. EH Constr.*, 134 S.W.3d 575, 583 (Ky. 2004)). In the negligence context, the inquiry is whether a "'breach of a duty [arose] independently of any contract duties between the parties.'" *Id.* at 792 (quoting *Presnell*, 134 S.W.3d at 589 (Keller, J. concurring) (emphasis omitted)). Where there is no independent duty beyond the contract, the doctrine requires that recovery be through contract law.

Whaley insists that the economic loss rule does not prevent his negligence claim because (1) the parties did not have a commercial contract; (2) Definitive Roofing breached an independent duty owed by construction contractors which caused property damage beyond the roof; and (3) roof repair is a service contract. [Record No. 103 at 18–19] Definitive Roofing disagrees. It contends (1) Whaley's argument that this was not a commercial contract is disingenuous, contradictory, and irrelevant; and (2) the dispositive question is whether Whaley asserts any tort claim independent of the contract claim, which he does not. [Record No 108 at 8–9]

Despite Whaley's arguments, the parties' contract was not exclusively a service contract as was at issue in *Louisville Gas & Elec. Co. v. Cont'l Field Sys., Inc.*, 420 F. Supp. 2d 764 (W.D. Ky. 2005), where a machine part was repaired with soldering. Here, the roof repair included raw goods, a design, and installation. While Kentucky's highest court has yet to define the contours of the economic loss doctrine, several federal courts have predicted the doctrine would be applied to commercial construction contracts. *Morris*, 2015 WL 7188479, at *4 (collecting cases). Further, Whaley identifies no independent duty Definitive Roofing

- 15 -

owed beyond those in the contract.  To be sure, he does assert that "construction contractors owe a clear duty to property owners with whom they are in privity of contract not to use faulty materials."  [Record No. 103 at 19]  That said, he fails to demonstrate how that duty is independent from the contractual one or even how the materials Definitive Roofing used were "faulty."  *See id.*

Although he argues that the damage to the building's interior is a claim separate from his contractual claim, the contract includes warranties on installation and materials and contemplates that faults of either were to be addressed and remedied by the final walk through that he (through his counsel) prevented.  In any event, the economic loss doctrine defines "economic loss" as loss of the value of the product and *consequential* loss caused by the product defect.  *See Mt. Lebanon Personal Care Home, Inc.*, 276 F.3d at 848.  Finally, the parties executed a commercial contract as it was for a *commercial* building which was insured by *commercial* insurance and the building was used primarily for business purposes.

In short, because Whaley's claims alleging negligence mimic his breach of contract claims and he identifies no independent duty owed by Definitive Roofing, the economic loss doctrine bars his negligence claim.

### KCPA Violation

Whaley's Kentucky Consumer Protection Act violation claim against Definitive Roofing fails for similar reasons.  KRS § 367.220 creates a private right of action for "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by KRS 367.170, may bring an action . . . to recover actual damages."  Whaley fails

to provide evidence upon which a jury could find that the roof repair was "*primarily* for personal, family or household purposes." KRS § 367.220 (emphasis added). Having personal mail delivered to the building and staying there when it flooded are insufficient. [Record No. 103 at 17]

### Breach of Contract

Both parties bring breach of contract claims against the other. Whaley's Amended Complaint asserts that Definitive Roofing breached the contract by failing to properly perform the contractual obligations pertaining to the design, scope, installation, etc., of the roof repair. [Record No. 12 at ¶¶ 35–37] Definitive Roofing moves for summary judgment on Whaley's breach of contract claim, contending he fails to produce any evidence of a roofing defect, identify any damages that are recoverable against Definitive Roofing, identify evidence demonstrating that he did not block the final inspection, and demonstrate that the assignment by Lilie Whaley was not a sham. [Record No. 94 at 9–19] And it moves for summary judgment on its own breach of contract counterclaim against Whaley, seeking damages on the unpaid portion of the contract. *Id.* at 22.

"The interpretation of contracts is an issue of law for the court to decide." *PBI Bank, Inc. v. Signature Point Condominiums LLC*, 535 S.W.3d 700, 717 (Ky. Ct. App. 2016) (citation modified). The Court must first determine "whether a contract is ambiguous." *See Butt v. Indep. Club Venture, Ltd.*, 453 S.W.3d 189, 192 (Ky. Ct. App. 2014) (citing *Morganfield Nat'l Bank v. Damien Elder & Sons*, 836 S.W.2d 893, 895 (Ky. 1992)). An ambiguous contract is one that a reasonable person would find "susceptible to different or inconsistent interpretations." *Marshall v. Kentucky Farm Bureau Mut. Ins. Co.*, 618 S.W.3d 499, 502 (Ky. Ct. App. 2020) (citation modified). If the Court finds an ambiguity, then it will "gather, if

possible, the intention of the parties from the contract as a whole, and in doing so will consider the subject matter of the contract, the situation of the parties and the conditions under which the contract was written." *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003) (citation modified). When there is no ambiguity, however, "a written instrument will be enforced strictly according to its terms, and a court will interpret the contract's terms by assigning language its ordinary meaning." *Id.* (citation modified).

A court interpreting a contract, must construe it as a "'whole, giving effect to all parts and every word in it if possible.'" *Am. Dairy Queen Corp. v. Fortune St. Rsch. & Writing Inc.*, 753 F. Supp. 2d 675, 679 (W.D. Ky. 2010) (quoting *City of Louisa v. Newland*, 705 S.W.2d 916, 919 (Ky. 1986)). Generally, the parties' intention regarding a written contract "must be gathered from the four corners" of that contract. *PBI Bank*, 535 S.W.3d at 717 (citation modified). But "if the writing is ambiguous, the factual question of what the parties intended is for the jury to decide." *Id.* (citation modified).

**First to Breach:** Both parties argue that the other breached first. Whaley argues that Definitive Roofing breached by failing to complete the roof job, including failing to cure persistent leaks, conduct a final walk through, and issue a Certificate of Warranty. [Record No. 103 at 14, 21–22] Conversely, Definitive Roofing insists that Whaley breached the contract by denying Vanlandingham access to the roof for final inspection. [Record No. 94 at 15] It contends that the contract provided for the inspection, "during which a punch list could have been prepared and the need for repairs identified." *Id.* Had the roof passed inspection, payment would have been due to Definitive Roofing withing ten days, and a Certificate of Warranty would have been issued to Whaley. *Id.* at 16. Thus, if Whaley experienced continued leaks, he could have sought redress *via* the warranty. *Id.*

- 18 -

A "'contracting party impliedly obligates himself to cooperate in the performance of his contract and the law will not permit him to take advantage of an obstacle to performance which he has created or which lies within his power to remove.'" *PBI Bank*, 535 S.W.3d at 718 (quoting *Ligon v. Parr*, 471 S.W.2d 1, 3 (Ky. 1971)). Such a violation may rise to the level of a breach when a party's lack of performance (or prevention of performance) is "material or substantial" under the contract. *See Pinson Drilling, Inc. v. Williams*, No. 2013–CA–001599–MR, 2014 WL 4177424, at *2 (Ky. Ct. App. Aug. 22, 2014) (citations omitted); *Hall v. Rowe*, 439 S.W.3d 183, 186–87 (Ky. Ct. App. 2014); *Dalton v. Mullins*, 293 S.W.2d 470, 476 (Ky. 1956). A breach is material when it "'substantially defeats the contract's purpose, or the breach is such that upon a reasonable interpretation of the contract, the parties considered the breach as vital to the existence of the contract.'" *Self–Made, LLC v. SKPR KY–2, LLC*, No. 2014-CA-000741-MR, 2015 WL 6778688, at *2 (Ky. Ct. App. Nov. 6, 2015) (quoting 23 WILLISTON ON CONTRACTS § 63:3 (4th ed.)). And when one party refuses to perform part of the contract, the other has the right to treat that "'as a breach, to abandon the contract, and to depart from further performance on his own part and finally demand damages.'" *Hall*, 439 S.W.3d at 186 (emphasis omitted) (quoting *W. Kentucky Coal Co. v. Nourse*, 320 S.W.2d 311, 314 (Ky. 1959)).

Where "there are breaches of the contract, the court must determine who was the first party to breach, because 'a party who commits the first breach of a contract is deprived of the right to complain of a subsequent breach by the other party.'" *Mays v. Patrick*, No. 2022-CA-0549-MR, 2023 WL 3555510, at *9 (Ky. Ct. App. May 19, 2023) (quoting *Nourse*, 320 S.W.2d at 314). Stated differently, the "first breach rule in Kentucky operates as a form of the 'clean hands' doctrine, barring all claims brought by the first breaching party." *ClubSpecialists Int'l,*

*LLC v. Keeneland Ass'n, Inc.*, Civil Action No. 5:16-345-KKC, 2018 WL 2050134, at *3 (E.D.
Ky. May 2, 2018).  The Supreme Court of Kentucky's rationale underlying this rule is that "'a
wrongdoer should not be allowed to profit from his or her own wrongdoing.'"  *Id.* (quoting
*McMullin v. McMullin*, 338 S.W.3d 315, 323 (Ky. 2011)).  "It is a fundamental principle in
the law of contracts that before one may obtain the benefits the contract confers upon him, he
himself must perform the obligation which is imposed upon him."  *Nourse*, 320 S.W.2d at 314
(citation omitted).

Here, Definitive Roofing argues that Whaley breached the contract by denying it an
opportunity to inspect and remedy leaks allegedly caused by the roof recovering.  It supports
this contention by providing multiple emails between counsel that demonstrate its attempts to
gain entry to the property that were blocked by Whaley's counsel.  [Record No. 94 at 6–7]
Concerning the materiality of the breach, it references a provision in the contract that
conditions the second payment installment and warranty issuance on a final walk through that
never occurred.  *Id.* at 15.

Whaley testified that he was unaware of Vanlandingham's attempts to access the
property for a final walk through.  [Record No. 103 at 15]  But Whaley does not dispute that
no walk through occurred.  *Id.*  Nor does he challenge Definitive Roofing's reading of the
walk-through inspection being a condition precedent to the second payment installment.  *Id.*
Instead, Whaley insists that, if he knew Vanlandingham was attempting to inspect or fix the
roof, he would not have blocked his access to the building.  *Id.*  And because it was his counsel
who handled the communications, Whaley argues that he cannot be liable for breaching the
contract by preventing Definitive Roofing from performing the walk through.  *Id.*

Definitive Roofing, of course, disagrees. It argues that Whaley's counsel was functioning as his "employee, agent, and fiduciary," which prevents Whaley from now arguing that his attorney's actions do not represent his own. [Record No. 108 at 2] Definitive Roofing insists that, "[h]ad the Plaintiff permitted the inspection, any building defect and building code issues could have been raised and any further needed work could have been identified and performed." *Id.* at 3. And because Whaley argues that Definitive Roofing failed to reach substantial completion on the roof, he concedes that he was the first to breach the contract by blocking the inspection. *Id.*

Definitive Roofing provides a litany of emails its counsel sent to Whaley's attorney requesting access to the roof after receiving a demand letter, claiming a roofing defect was being investigated. [Record No. 94-2 at 144] It further asserts that, once Whaley filed this lawsuit, Vanlandingham was denied access to the roof on the basis that a lawsuit was ongoing. [Record No. 108 at 3] By way of background, the following facts are undisputed: (1) Vanlandingham's active repair to the roof ceased on March 13, 2024; (2) a walk through inspection with Definitive Roofing and ERC representatives was scheduled for April 8, 2024; (3) under the contract, the inspection was a condition precedent to Definitive Roofing receiving the second payment installment and the issuance of warranties to Whaley; and (4) Definitive Roofing and ERC were poised to conduct the April 8th inspection but were denied access by Whaley's attorney.

Definitive Roofing's counsel either requested access to the roof to inspect the purported leaks and repair them or referenced a prior request to do so on the following dates: April 3, 2024 [Record No. 94-2 at 144]; April 4, 2024 [Record No. 94-2 at 145]; April 23, 2024 [Record No. 94-2 at 145]; May 14, 2024 [Record No. 94-2 at 149]; June 28, 2024 [Record No. 94-2 at

122–25]; and August 5, 2024 [Record No. 94-2 at 156].  On some of these occasions, counsel notifies Whaley's attorney that refusing the walk-through inspection deprives Definitive Roofing the opportunity to correct any potential issues found with the roof.  [*See, e.g.*, Record No. 94-2 at 145.]  And on one occasion, counsel pleads with Whaley's attorney that the delay in completing the walk through and receiving payment is putting Definitive Roofing in a bind as it still owed over $160,000 to subcontractors.  *Id.* at 145.  Once counsel for Definitive Roofing learned that Whaley hired an engineer to inspect the roof, counsel again requested that Vanlandingham be allowed an opportunity to access the roof at that time but was denied. *Id.* at 145–47.

Whaley does not deny that his attorney prevented Definitive Roofing and ERC from accessing the roof between March 14, 2024, through August 28, 2024, when he filed the lawsuit.  Nor does he deny that his attorney continued to deny roof access, claiming that the lawsuit prevented it.  Instead, Whaley argues that *he was unaware* of Definitive Roofing's attempts and *had he known*, he would have allowed Vanlandingham on the roof.  He insists that his attorney's refusals cannot be imputed on him such that he is liable for breach. Unsurprisingly, he cites no legal support for this theory.

Whaley's argument is a legal, not a factual one  It is well settled that when an attorney acts within the scope of his or her representation, in the "absence of collusion, fraud, or other inequitable conduct between the attorney and an opposing party," the client is "bound by the acts of the attorney."  *Herfurth v. Horine*, 266 Ky. 19, 98 S.W.2d 21, 23 (Ky. 1936) (citations omitted).  Under the facts presented, nothing indicates that there was any "collusion, fraud, or other inequitable conduct" between Whaley's attorney and an opposing party.  Nor is there any indication that Whaley's counsel arranging access to the roof was somehow outside the

scope of his representation. Thus, as a matter of law and notwithstanding his purported ignorance of Definitive Roofing's attempts, Whaley is bound by his attorney's actions in preventing the final walkthrough.

Whaley halfheartedly argues that there is a factual dispute surrounding whether the absence of the inspection and subsequent warranty was due to his refusal (through counsel) or Definitive Roofing's "failure to coordinate." [Record No. 103 at 22] But he must do more than make arguments at this juncture. Instead, he must point to specific evidence in the record upon which a jury could find that Definitive Roofing's lack of inspection was due to its failure to coordinate. But he references nothing. All the while, Definite Roofing provides a gaggle of emails demonstrating its counsel's many attempts to conduct an inspection. No reasonable jury could attribute the lack of inspection to Definitive Roofing. Therefore, the question remaining is whether Whaley preventing the final walk through was a material breach under the contract.

While issues surrounding materiality and breach ordinarily create a fact question for a jury, under the circumstances presented, it does not. *See e.g.*, *ClubSpecialists Int'l*, 2018 WL 2050134, at *4–5 (holding party was first to commit a material breach as a matter of law based on contract interpretation and undisputed facts); *see also Nash-Finch Co. v. Casey's Foods, Inc.*, No. 6:15-CV-00086-GFVT, 2016 WL 7106395, at *3–4 (E.D. Ky. Dec. 5, 2016), *aff'd*, 762 F. App'x 218 (6th Cir. 2018) and *Self–Made*, 2015 WL 6778688, at *2–3. When both parties argue the other breached, it is the province of the Court to "determine who was the first party to breach, because 'a party who commits the first breach of a contract is deprived of the right to complain of a subsequent breach by the other party.'" *Mays*, 2023 WL 3555510, at *9 (quoting *Nourse*, 320 S.W.2d at 314).

- 23 -

Whaley works hard to generate a material fact issue for the jury regarding the source and timing of the water leaks and subsequent damage. [*See* Record No. 103 at 8–9, 11–12.] But to get to that issue, he must overcome Definitive Roofing's allegation that he was the first to breach when he denied access for the final walk-through inspection. Whaley does not dispute that the final walk through provided an opportunity for the parties to raise and remedy any issues with the roof before the contract was completed. Nor could he. The ordinary meaning of "final walk-through inspection" is the last chance for the customer to raise concerns about the work conducted and to ensure that it was done as contracted before final payment is due. And because the parties' contract included that the issuance of warranties was also contingent on the final inspection, it was ERC and Definitive Roofing's final opportunity to make modifications before issuing their respective warranties.

Other than blaming his attorney, Whaley points to no reasonable basis for refusing the final inspection. [*See* Record No. 103 at 14–15.] Had the final walk through commenced as planned, Vanlandingham could have observed the nature of any actual defect to the roof and made arrangements to remedy the defect. Whaley also would have had the benefit of ERC present, which has a vested interest in the roof's proper installation as it was providing a warranty on materials. Had ERC refused to issue its warranty based on Definitive Roofing's improper installation, Whaley would have had even more leverage to compel Vanlandingham to fix the defects. The final inspection was scheduled just three weeks after work ended on the roof. Taking Whaley's facts as true, the roof continues to leak, which means that what could have been three weeks of water infiltration related damage has ballooned into nearly two years of the same.

No matter the reason, the contract is unambiguous about the necessity of final inspection to fully perform the contract. It is undisputed that Definitive Roofing was denied access to the roof after March 13, 2024, and beyond August 28, 2024, when the lawsuit commenced. Under "a reasonable interpretation of the contract," the final walk through "was vital to the existence of the contract" because it was a condition precedent to the issuance of warranties and final payment, rendering Whaley' refusal a material breach. *Self–Made*, 2015 WL 6778688, at *2.

Whaley was the first to breach as a matter of law, and he may not recover on any uncompleted portion of the contract because "the law will not permit him to take advantage of an obstacle to performance which he . . . created or which [was] within his power to remove." *PBI Bank*, 535 S.W.3d at 718; *see also Mays*, 2023 WL 3555510, at *9–10 (granting specific performance where appraiser was refused entry to the home, preventing buyers from obtaining financing before closing date) and *Espinosa v. Dutt*, No. 2020-CA-0576-MR, 2021 WL 3437966, at *3 (Ky. Ct. App. Aug. 6, 2021) (noting no obstacle to performance of contract where the contractor "was not denied access to the property or prevented from working on the property").

Further, the evidence demonstrates that Definitive Roofing (through counsel and Vanlandingham) did everything it could to complete its obligations under the contract. While roof repairs were ongoing through March 6th and 12th of 2024, emails between Whaley and Vanlandingham demonstrate that, when Whaley complained that water was leaking from the roof, Vanlandingham responded "I will get it taken care of. I was planning on being there tomorrow." and "I will see you in the morning." respectively. [Record No. 94-10 at 46, 50] As outlined above, counsel for Definitive Roofing repeatedly sought an opportunity to

- 25 -

complete the contract under the contract's terms for the five months preceding this lawsuit. And because Whaley blocked Definitive Roofing from completing the final inspection, it had the right to treat that refusal as a breach, abandon the contract, cease its performance, and demand damages. *Hall*, 439 S.W.3d at 186.

### Definitive Roofing's Counterclaims

Definitive Roofing moves for summary judgment on its counterclaims against Whaley for breach of contract, unjust enrichment, quantum meruit, and fraud by misrepresentation. [Record No. 94] It seeks compensatory damages and punitive damages (as applicable) on those claims. [Record No. 83 at 5]

When a party "moves for summary judgment on its own claims, for which it carries the burden of persuasion at trial, the burden is high." *League of Women Voters of Ohio v. LaRose*, 741 F. Supp. 3d 694, 705 (N.D. Ohio 2024). The movant must demonstrate the "absence of material fact disputes on all of the essential elements of its claim." *Id.* at 705–06 (citing *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012)). To be sure, the movant

> must present evidence that would entitle [it] to a directed verdict if that evidence were not controverted at trial. If the [nonmovant responds] to the motion with controverting evidence which demonstrates a genuine issue of material fact, [the] motion must be denied. However, if, after analyzing the combined body of evidence presented by both parties, the evidence is such that no reasonable jury could find in favor of the [nonmovant], then summary judgment will be entered on behalf of the [] movant.

*United States v. Long*, 121 F. Supp. 3d 763, 767 (N.D. Ohio 2014) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)); *see also Viet v. Le,* 951 F.3d 818, 823 (6th Cir. 2020). Thus, in addition to showing no material fact disputes on all essential elements, the movant must also demonstrate that no reasonable juror could find in the nonmovant's favor on each element.

- 26 -

## Breach of Contract

In addition to arguing that Whaley breached by blocking the final inspection, Definitive Roofing's counterclaim alleges that Whaley breached "by failing to issue payment for the agreed upon roofing services provided by Definitive Roofing and by failing to engage in good faith and fair dealing." [Record No. 83 at ¶ 10] Whaley does not move for summary judgment on the counterclaims but instead argues that issues of fact remain on each counterclaim fit for a jury to decide. [*See* Record No. 103 at 20, 22–24.]

Definitive Roofing argues that it was actively performing the contract when Whaley breached it, entitling it to recover the full contract price. [*See* Record No. 94 at 22 (citing *Dalton*, 293 S.W.2d at 476 and *O'Bryan v. Mengel Co.*, 224 Ky. 284, 288, 6 S.W.2d 249, 251 (1928)).] It asserts that under the contract, it is entitled to " a final payment of $214,534.50" along with a "2% monthly interest on $214,534.50, from [April 8, 2024] (the date of the cancelled inspection)" and until paid in full. *Id.*

As an initial matter, the parties do not contest that Whaley only paid $214,534.50 of the total contracted price $429,069.00. Nor do they dispute that Whaley has in his possession $105,465.18 of insurance proceeds for the roof repair. As discussed previously, Whaley was the first to breach. Therefore, Definitive Roofing is entitled to damages under the contract.

Definitive Roofing insists that it is entitled to the full remaining payment of $214,534.50 at 2% monthly interest since the original inspection date. But the contract addendum provides the following regarding the anticipated insurance funds, *not* in Whaley's possession: "Vanlandingham agrees that payment delay by parties that Whaley has no control over will not be held against him in any way especially in terms of money owed by Sedwick [insurer], penalty or interest." [Record No. 94-10 at 133] It further provides that "Whaley

fully agrees to do everything in his ability . . . to assist Vanlandingham with prompt approval and payment from Sedwick." *Id.* This provision appears to modify the payment terms which note that there are two installments, the first having already been paid and the second for "$214,534.50 due within 10 days of completion of job and a final walk through has been done. If balance is not paid within 30 days, 2% interest will be added monthly until paid and all collection costs will be added to the amount." *Id.* at 134. Thus, it appears from the record that the remaining amount owed ($109,069.32) includes Whaley's $1,000.00 policy deductible and the roof's depreciation amount, potentially recoverable once proof of completion was provided to the building's insurer. *See id.* at 34.

**Good Faith and Fair Dealing:** Although Definitive Roofing does not tackle the issue head on, it implies that Whaley violated the covenant of good faith and fair dealing because he sought a lawsuit from the outset. In addition to its claim that Whaley blocked the final inspection, it refers to the following course of events to support its contention. [Record No. 94 at 6]

First, it references Whaley's testimony that he began seeking legal counsel roughly five to seven days after Definitive Roofing started working on the roof and well before it completed the work. *Id.* at 5.

Second, it claims that Whaley surreptitiously recorded Vanlandingham to bolster his pre-planned lawsuit. *Id.* Concerning motive, it asserts that the relationship between the parties began to deteriorate when Definitive Roofing "refused to bill the insurance company for property improvement projects that were not related to the storm damage." *Id.*

Third, Definitive Roofing provides emails demonstrating that when Whaley was preventing it roof access, he was actively planning to add a cannabis greenhouse to the roof

but lacked the funds. [Record No. 94 at 7–8 (implying this lawsuit and the one against the insurer were alternative ways Whaley planned to make money).] It notes that Whaley testified that he asked Dicks to assess the recovered roof's ability to hold a greenhouse on May 2, 2024, when she came to gather information for her report on Vanlandingham's work. *Id.* at 7 (date typo in original).

Fourth, it alleges that Whaley stopped running the air conditioner during the summer months to encourage mold growth. *Id.* at 6.

Finally, it asserts that Whaley's parallel action in state court against the building's insurer seeks overlapping damages, further suggesting that he was not engaging in good faith and fair dealing but merely seeking money. *Id.* at 14.

Whaley does not refute that he contacted an attorney before the roof recover was completed, secretly recorded Vanlandingham to create evidence for his pre-planned lawsuit, or that he planned to add a cannabis greenhouse to the roof. [*See generally* Record No. 103.] But he insists that the damages against the insurance company are district from those sought from Definitive Roofing. *Id.* at 10. Specifically, the lawsuit with the insurer stems from the "2022 wind event and seeks contractual insurance benefits," whereas the damages from Definitive Roofing are for defects causing water infiltration *after* the roof was recovered. *Id.* at 11. He further contends that he initiated the suit against the insurer to avoid an issue with the statute of limitations. *Id.* And he maintains that he does not seek overlapping damages. *Id.* Regarding the allegation that he ceased running the building's air conditioner, he references his own testimony that he runs the air intermittently and that no mold was present before the roof repair. *Id.* at 4 n.20, n.21.

The Court concludes that, in addition to being the first to breach, Whaley also violated the "'implied covenant of good faith and fair dealing'" because "'contracts impose on the parties thereto a duty to do everything necessary to carry them out.'" *PBI Bank*, 535 S.W.3d at 718 (quoting *Farmers Bank & Trust Co. of Georgetown, Kentucky v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005)). Here, Definitive Roofing has provided ample evidence that "'to support a conclusion that [Whaley] has engaged in some conduct that denied the benefit of the bargain originally intended by the parties.'" *Id.* (quoting 23 WILLISTON ON CONTRACTS § 63:22 (4th ed. 2004)). At a minimum, it has shown that Whaley prevented it from completing the contract, thereby denying it the benefit of the bargain originally intended (*i.e.*, full payment).

### Unjust Enrichment/Quantum Meruit

An unjust enrichment claim contains the following three elements: "(1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. App. 2009) (citation omitted). Quantum meruit consists of four elements: (1) "that valuable services were rendered, or materials furnished;" (2) "to the person from whom recovery is sought;" (3) "which services were accepted by that person, or at least were received by that person, or were rendered with the knowledge and consent of that person;" and (4) "under such circumstances as reasonabl[e] notified the person that the plaintiff expected to be paid by that person." *Quadrille Bus. Sys. v. Kentucky Cattlemen's Ass'n, Inc.*, 242 S.W.3d 359, 366 (Ky. App. 2007) (citing 66 AM. JUR. 2D RESTITUTION AND IMPLIED CONTRACTS § 38 (2001)).

In its counterclaim, Definitive Roofing alleges that it has not been compensated for services rendered to Whaley, including "installing new gutters and downspouts, installing new drains, replumbing and rerouting drain pipes, taking down trees, replacing covered skylights at a separate property, pressure washing and painting, and transporting wood and metal from a separate property back to the job site." [Record No. 83 at ¶ 14] It further asserts that allowing Whaley to retain those benefits without payment would be inequitable. *Id.* at ¶ 21. However, its motion for summary judgment fails to address any of these services purportedly provided to Whaley, nor does it provide proof of the cost of these services rendered. [*See* Record No. 94 at 23–24 (discussing only the lack of final contract payment).] Thus, it fails to provide sufficient evidence upon which a jury could determine that these services (not covered by the contract) were provided to benefit Whaley.

To the extent that Whaley's unjust enrichment and quantum meruit claims cover materials and services provided under the contract, they fail as a matter of law. Because a valid and enforceable contract existed between the parties, those alternative claims must be denied. *See Superior Steel*, 540 S.W.3d at 778 (citation omitted); *Normandy Farm, LLC v. Kenneth McPeek Racing Stable, Inc.*, 701 S.W.3d 129, 143 (Ky. 2024) (citation omitted).

### Fraudulent Misrepresentation

Definitive Roofing must prove the following elements by clear and convincing evidence to succeed on a fraudulent misrepresentation claim:

> (1) that the declarant made a material representation to the plaintiff, (2) that this representation was false, (3) that the declarant knew the representation was false or made it recklessly, (4) that the declarant induced the plaintiff to act upon the misrepresentation, (5) that the plaintiff relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the plaintiff.

*Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009) (citing *United Parcel Service Company v. Rickert*, 996 S.W.2d 464 (Ky. 1999)).

Definitive Roofing argues that Whaley committed fraud in the inducement when he represented that he owned the property when he knew he did not. [Record No. 83 at ¶¶ 24–27] It provides testimony from its corporate representative stating Whaley's representation that he owned the property was material to it deciding to enter a contract with him. [Record No. 94 at 24] Finally, it claims it has suffered damages because Whaley now refuses to pay. [Record No. 83 at ¶ 30] It asserts that the only element in dispute is "whether the plaintiff knew that his misrepresentation of ownership was false, and whether he made it with reckless disregard for the truth." [Record No. 94 at 24]

Whaley does not respond to Definitive Roofing's fraudulent misrepresentation claim in his response. [*See generally* Record No. 103.] That said, Definitive Roofing has not met its burden on this claim because it has failed to point to specific evidence in the record on each element. Nor does it show that no reasonable jury could find for Whaley on this claim. Further, the clear and convincing evidence standard sets an even higher bar that Definitive Roofing fails to meet.

### Whaley's Motion for Sanctions

Whaley moves for sanctions against Definitive Roofing for amending its Counterclaim to include a claim for fraudulent inducement that "contains demonstrably false assertions." [Record No. 101 at 1] More specifically, he claims that he had verbal and text communications with Eby concerning the legal owner of the property. *Id.* And because Eby was Definitive Roofing's representative, this knowledge is imputed on it. *Id.* He makes several other assertions regarding what "Defendant" had or knew—but neglects to identify to whom he's

referring. *See id.* at 3–4. This matters because his motion conflates Eby and Definitive Roofing; and (as discussed previously) Eby was an independent contractor and not an employee of Definitive Roofing.

Whaley asks that the Court strike Definitive Roofing's motion to amend its Counterclaim, award him reasonable expenses incurred in responding to that motion (including attorney's fees), impose appropriate sanctions against Definitive Roofing and/or its counsel, and grant other relief that it deems just and proper. [Record No. 101 at 1] To start, Definitive Roofing's motion to amend its Counterclaim was filed an incredible four months before Whaley filed this motion. [*Compare* Record No. 74 *with* Record No. 101.] What's more, Whaley never responded to Definitive Roofing's motion to amend its Counterclaim to include a claim for fraudulent inducement. [*See* Record No. 79.] Despite these facts, he seeks attorney's fees for the work allegedly spent in responding to the motion.

Definitive Roofing identifies these discrepancies and more in response. It argues that the motion is a roundabout attempt to file a dispositive motion beyond the deadline in the Scheduling Order. [Record No. 104 at 1] Definitive Roofing insists that Whaley has been seeking sanctions against it ever since counsel exposed Whaley's multiple lawsuit charade in which the building's owner is identified superlative style "as the person most likely to win a recovery" based on the facts and legal issues presented. *See id.* at 2. Adding fodder to the fire, it claims that Whaley filed a false Rule 11(c)(2) certification that he served this motion for sanctions on July 31, 2025. *Id.* at 3. Contrary to that certification, it was August of 2025 when Whaley's counsel served Definitive Roofing an *entirely different* motion for sanctions. *Id.* Thus, it argues that it is entitled to relief against Whaley for his false certification and motion which is tendered in bad faith. *Id.*

- 33 -

For some unknown (yet surmisable) reason, Whaley elected not to tender a reply.

Nothing in Whaley's motion supports a finding that sanctions against Definitive Roofing are appropriate. While Eby may have been privy to the issues surrounding the building's ownership, Whaley presents no *evidence* supporting that *Definitive Roofing* was aware and/or told by Whaley the identity of the legal owner.[5] Therefore, his motion will be denied.

On the other hand, Definitive Roofing *does* provide evidence demonstrating that Whaley's certification concerning this motion is false. It also makes a compelling argument that Whaley has filed this motion in bad faith with intent to harass it for exposing Whaley's ownership misrepresentation. It further references his request for attorney's fees for a response to Definitive Roofing's motion to amend its Counterclaim *that he never filed*. It also alleges that the motion for sanctions is an improper attempt to circumvent the deadlines in the Scheduling Order. But unfortunately for Definitive Roofing, Rule 11 of the Federal Rules of Civil Procedure requires that a motion for sanctions comply with the safe harbor rule, even when sought in response to a motion for sanctions. *See Penn, LLC v. Prosper Bus. Dev. Corp.*, 773 F.3d 764, 766–68 (6th Cir. 2014).

That said, the Court has broad discretion to impose sanctions for Rule 11 violations, and it may do so *sua sponte*. *Arnold v. Liberty Mut. Ins. Co.*, 392 F. Supp. 3d 747, 782 (E.D. Ky. 2019) (citing *Ridder v. City of Springfield*, 109 F.3d 288, 298 (6th Cir. 1997) and *Mann v. G & G Mfg., Inc.*, 900 F.2d 953, 958 (6th Cir. 1990)); Fed. R. Civ. Pro 11(c)(3). Finding such

---

[5]    His assertions that he verbally told Vanlandingham he did not own the property and that Definitive Roofing had it access to the scope of work provided to the insurer that listed Louis Whaley as the insured do not suffice in showing Definitive Roofing committed a Rule 11 violation in amending its Counterclaim.

- 34 -

a basis, the undersigned will direct counsel for Whaley to show cause why the conduct described above does not violate Rule 11(b).

**IV.**

Based on the forgoing analysis and discussion, it is hereby

**ORDERED** as follows:

1.      Defendant IB Roof Systems, Inc.'s motion for summary judgment [Record No. 92] is **GRANTED**.

2.      Defendant Definitive Roofing and Specialty Coatings, LLC's motion for summary judgment on Plaintiff Mark Whaley's claims [Record No. 94] is **GRANTED**.

3.      Defendant Definitive Roofing and Specialty Coatings, LLC's motion for summary judgment on its counterclaims [Record No. 94] is **GRANTED** with respect to breach of contract and violation of good faith and fair dealing but **DENIED** with respect to quantum meruit, unjust enrichment, and fraudulent inducement.

4.      Defendant Definitive Roofing and Specialty Coatings, LLC and Defendant IB Roof Systems, Inc.'s motions to exclude Katie Dicks [Record Nos. 93 and 95] are **DENIED** as moot.

5.      Defendant Environmental Roofing Components, LLC's motion for summary judgment or, alternatively to exclude Katie Dicks, [Record No. 96] is **GRANTED** with respect to summary judgment but **DENIED** as moot with respect to its motion to exclude.

6.      Plaintiff Mark Whaley's motion for sanctions [Record No. 101] is **DENIED**.

7.      The issues remaining for the jury trial currently set to begin March 17, 2026, are Defendant Definitive Roofing and Specialty Coatings, LLC's counterclaims for quantum

meruit, unjust enrichment, and fraudulent misrepresentation against Mark Whaley.  Those parties are **DIRECTED** to tender updated exhibit and witness lists **within 7 days**.

8.      To resolve the remaining issue concerning damages and interest owed under the contract, Plaintiff Mark Whaley and Defendant Definitive Roofing and Specialty Coatings, LLC are **DIRECTED** to tender supplemental briefs addressing the contract's terms regarding the remainder of the monies owed under the contract that are *not* within Whaley's possession. The parties should refer to the Court's outline of the relevant contract provisions in the counterclaim breach of contract section.  Briefs are due on or before **February 27, 2026**.  No replies are necessary or allowed.

9.      Attorneys of record for Plaintiff Mark Whaley are **DIRECTED** to **SHOW CAUSE** on or before **February 20, 2026**, why their conduct (specifically described above) does not violate Rule 11(b) of the Federal Rules of Civil Procedure.

10.     The parties' joint motion for a hearing on forthcoming motions *in limine* [Record No. 127] is **DENIED** as moot.

11.     Defendant Environmental Roofing Components, LLC's motion *in limine* [Record No. 131] is **DENIED** as moot.

12.     Defendants Definitive Roofing and Specialty Coatings, LLC, IB Roof Systems, Inc. and Environmental Roofing Components, LLC's joint motion *in limine* [Record No. 132] is **DENIED** as moot.

13.     Defendants Definitive Roofing and Specialty Coatings, LLC's motion *in limine* [Record No. 133] is **DENIED** as moot.

14      Defendants IB Roof Systems, Inc. and Environmental Roofing Components, LLC's joint motion *in limine* [Record No. 134] is **DENIED** as moot.

15.    Plaintiff Mark Whaley's motion *in limine* [Record No. 136] is **DENIED** as moot.

16.    Plaintiff Mark Whaley's motion *in limine* [Record No. 137] is **DENIED** as moot with respect to evidence not pertaining to the surviving counterclaims but **otherwise remains pending**.

Dated:  February 17, 2026.

Danny C. Reeves, District Judge
United States District Court
Eastern District of Kentucky